+

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

KEVIN MCBURNEY, Plaintiff )
) CA 08 152T
v. ) C.A. No. 08-________

) **JURY TRIAL DEMANDED**
ALICE SMITH (Mattapoisett, MA) )
ALICE PESZKE (formerly Alice Sherman-Stonington, Connecticut
CATHERINE RACINE (Melbourne, FL), (Defendants)

**COMPLAINT (The parties are ALL McBurneys)**

Plaintiff, KEVIN MCBURNEY, technically, is not a resident of Rhode Island (herein after-'Kevin'). Defendants, (Alice Smith-hereinafter 'Smith', Alice Peszke hereinafter 'Peszke' and her sister, Catherine Racine, hereinafter 'Racine'- ***all relatives of Kevin's (aunts and great-aunts-all in their 80's),*** reside outside the state of Rhode Island-to the best of knowledge and information. JOHN F. MCBURNEY (hereinafter 'JFM'), a resident of Pawtucket, Rhode Island, is the plaintiffs father and sister of Smith and first cousin of Peszke and Racine. JFM is NOT at present a party to this action but he may be joined thereafter by cross claim action by the defendants-as they have threatened him previously- and/or by plaintiff by amendment based upon a multitude of admissions, disclosures and documents that JFM made about the defendants relative and germane to issues and matters involved with this litigation that support and prove the claims that plaintiff presents. John Healey (hereinafter 'Healey'), the half brother of Peszke and Racine and cousin of JFM and Smith, died on June 30, 1999. Healey was the claimed owner of a 3 family apartment house located at 25-27 Fruit Street in Pawtucket, RI (hereinafter 'Fruit St.'). Peszke and Racine are plaintiffs in Providence SC C.A. 04-1684

and Kevin and his common law wife, Belkis Florentino, now the title owner of Fruit St are named as defendants. The state court action relates to title ownership of Fruit St.; this action relates to Subornation of Perjury occurring during the course of that litigation-on or about February 9, 2006 with the defendants assistance and conspiracy therein and other related intentional tortious conduct-interference w/ prospective economic advantage slander of title and other state causes of actions based upon fraud and pendant hereto.

## NATURE OF THE ACTION

1. This case refers to the very tragic and unfortunate McBurney Family break-up. It reads as the latest (sad) chapter of a 'story within a story within a story'-1920's-present

2. The underlying story or controversy relates to title ownership of Fruit St property

3. There is pending the Providence Superior Court Civil Action-04-1684 as instituted by Peszke and Racine as plaintiffs against Kevin, Belkis Florentino and her brother Miguel Florentino. Defendants by this action filed a Declaratory Judgment to seek title and ownership of Fruit St. in March of 2004. Belkis Florentino has been the title holder by deed of same Fruit St. property since 2002. Prior to that time, Kevin acquired title to Fruit St. on November 16, 1996 but recorded this deed on June 21, 2001.(see pg 4) Kevin transferred to Miguel on 6/22/01, as a straw for Belkis, who then transferred to Belkis on July 22, 2002-JFM acting as notary in this transaction as well as the 1996 deed.

4. This cause of action arose as a result of the February 9, 2006 deposition of JFM undertaken by plaintiffs at their counsels office during the course of 04-1684 (hereinafter-'2/9/06 depo'). During this deposition, JFM testified under oath that his signature as notary on the 11/16/96 deed was false or otherwise a forgery and that he disavowed any knowledge or awareness of any transfer by deed of the Fruit St property by deed to Kevin

in 1996 or thereafter upon its recordation in 2001 and transfer to the Florentino's. By this deposition, JFM testified that none of it occurred. In fact, all of such had occurred and JFM testified falsely. This deposition was continued to April 8, 2006. JFM is age 85.

5. The deposition was re-convened at defendants office on April 8, 2008 (hereinafter '4/8/06 depo'). During this deposition, JFM's testimony was entirely and completely discredited. A multitude of JFM's original handwritten documents and other records of his were presented to JFM which all conclusively demonstrated that JFM not only witnessed and notarized all real estate transactions involving Healey, Kevin and Belkis but they also had clearly proven that JFM completely endorsed and supported Belkis Florentinos title, possession, ownership and complete renovation ($130k spent) on the Fruit St. property. The impeachment of JFM's testimony was so overwhelmingly clear that the only issue remaining was not ***'if'*** JFM had testified falsely during his 2/9/06 depo but rather ***'why'*** JFM lied during this proceeding. The reason he had done so was because of the defendants actions of extreme pressure, intimidation, coercion and deception exacted upon an 85 year old physically and mentally incapacitated man-JFM.

6. Prior to the 2/9/06 depo, JFM was poised and ready to assist the Florentino's and Kevin with the defense of 04-1684 to allow Belkis Florentino to retain full title, ownership and possession of the Fruit St. property. Peszke and Racine had signed a general 'Release' to any and all claims to this property and had otherwise disavowed and disclaimed any interest in same property throughout all times. JFM was in complete endorsement and agreement that Belkis/Miguel own the property as they had the resources and funds to renovate and repair it in 2001 as it was in condemned condition . JFM knew that Belkis/Miquel expended $130,000 of her own money for repairs to fix an

otherwise dilapidated and uninhabitable piece of property and he knew that Peszke and Racine had no valid claim to it. JFM knew such vital information because he was always acting as Peszke/Racine's attorney and was fully aware that these individuals, prior to 2001, had no desire or interest to undertake the task of fixing the property that they had released and disclaimed any interest in. After Healey died on 6/30/99, they just merely let the property go-until Belkis Florentino fixed it. JFM also knew and was ready to disclose that Peszke/Racine were aware that Belkis/Florentino were undertaking extensive repairs and they had waited until she was completed before they would act to file a lawsuit to claim the property based upon a 1946 Will-off the chain of title. JFM was ready to contravert Peszke/Racine to thereby help his son and common-law wife (Belkis/Miguel).

7. During 2006 and thereafter, it was discovered that Peszke, Racine and Smith had all conspired together to pressure, coerce, compel and intimidate this 85 year old man (JFM) into doing a 'complete about face' to then testify falsely during the 2/9/06 depo. There had been discovered a plethora of original (copies) of handwritten letters, records documents and other materials among the three defendants and JFM to indicate that JFM was mislead by acts of fraud undertaken by by Peszke, Racine and also Smith of Mattapoisett, MA (who always maintained close-ties communication and friendship with Peszke/Racine at all times). Peszke and Racine, with Smith's assistance 'behind the scenes', had needed to drive a wedge between JFM and Kevin in order to turn JFM against his own son to enable them to serve their interests to wrongfully lay claim to ownership of the Fruit St. property by their act of fraud.

8. An 85 year old frail, sickly (multiple stroke and heart attackes) and mentally not 100 percent man was taken advantaged by Peszke, Racine and Smith. As a result, a

father-son relationship has been destroyed; a strong Attorney-Client relationship came to an end and the planned prospective law partnership between father and son never came to fruition merely because Peszke, Racine and Smith do not want to see the Fruit St. property owned by a BLACK person (Belkis Florentino). Belkis and Kevin suffered severe financial loss andhardship because of the slandering of the title to this property as caused by Peszke, Racine and also Smith. Kevin and JFM do not speak to each other anymore and these may be JFM's last dying years as their once strong relationship will end on this 'sour note'.

9. This action is NOT a redundant version of 04-1684 nor should it have been made a compulsory counterclaim to 04-1684. It has independent standing in this Court on its own merits having accrued as a result of 2/9/06 depo. Smith,Peszke and Racine are not residents of Rhode Island and there is no jurisdiction in the state court. Likewise, there are no Statute of Limitations issues presented as well.

10. Further, it is one thing to testify falsely at an innocuous deposition hearing in a small stuffy cubicle office of the attorney (happens frequently). But it is quite 'another thing'-a qualitative difference-to testify falsely before Federal Judge or Magistrate in the majestic arena of the Federal Court-eye ball to eye-ball with the person on the bench. It is believed that JFM will not testify falsely under these circumstances and will admit to the legitimacy of the deeds in question and will acknowledge the wrongful actions of Peszke, Racine and Smith. This is particularly true since there shall be made available an handwriting experts opinion who has compared all relevant documents and finds that JFM's signatures on the disputed deeds are genuine.JFM will 'fess-up' at that point. Once he does then it shall deliver a 'lethal blow' to all claims that Peszke and Racine assert.

## JURISDICTION AND VENUE

11. The Court has subject matter jurisdiction under Section 28 U.S.C. Section 1332 (diversity of Citizenship) with the requisite amount of controversy exceeding $75,000, the required amount as set forth herein. The Court has supplemental subject matter jurisdiction of the pendant state law claims under 28 U.S.C. Section 1367.

__. Venue is also proper because defendants Smith and Peszke reside and are found within this Courts district. Defendant, Racine, a resident of Florida, has established strong and formidable ties and contacts with this state as she is the party plaintiff who has instituted litigation in 04-1684 and as such has availed herself within the jurisdiction of the Rhode Island court system.

## FACTS-(A story within a story...)

12. Peszke (formerly Alice Sherman) and Racine, along with every member of the family or heir at law of MARY A. SHERMAN executed each of their signatures onto a Release that is undated. All of these individuals were children, spouses or beneficiaries of Mary A. Sherman. Each of the signatures are genuine, accurate and complete. **Exhibit No. 1** is a copy of the same Release with the original document still remaining in the possession of Kevin. Peszke and Racine have not disputed the genuineness of the document or their signatures affixed thereto. Of all signatures made, only Peszke/Racine were still alive at Healeys death-6/30/99.

13. Peszke/Racine and the other releasees waived and signed away all of their right, title and (future) interests that they 'might' be able to acquire under the 1946 Will of their aunt Alice C. McBurney (not married and without children) then the title owner of Fruit

St **(Ex. 2).** This Will, un-revoked and effective upon her death in 1947, sets forth that 'Susan M. Green (sister) shall hold the property in trust (the trust estate) for Green, Healey and Catherine McBurney-mother of Green, Mary A.Sherman and Alice C. McBurney (grandmother of Healey, Peszke an Racine). There was no separate trust document setting forth the particulars. The Will sets forth that upon the death of the last of the 3 named individuals, the trust shall terminate and the trust estate shall pass and be transferred to Mary A, Sherman, her heirs and assigns forever'. The last of named individuals, John F. Healey died on 6/30/99 which would have been the effective date.

14. Both, JFM and Healey among others kept all details of the 'probate matters' away from Kevin McBurney. They kept insisting, "Don't worry about the sisters (Peszke/Racine), they want nothing to do with the property, they signed a release as to any claim to it". They had mostly lived out of state and completely rejected and disavowed any interest in the property as they never contributed anything to the property or to their brother. They never even bothered to attend to his funeral. When the city of Pawtucket sold the property at Tax sale in 1999, the informed Peszke and Racine were 'disinterested'. So Kevin McBurney (90's) 'trusted' his family to exclude the sisters as a problem and never researched to learn of these 'probate matters' . Belkis Florentino later in 2001 also received the same assurances as well. Both relied upon the Release-**Ex. 1**

15. When Healey died, neither Peszke nor Racine attended the funeral or contributed any funds for funeral expenses or expenses of the Fruit St property. The City of Pawtucket sold the property at tax sale-twice- in 1999 and 2000 and each time, the informed plaintiffs were 'disinterested'. Neither purchaser at tax sale had ever foreclosed upon a right of redemption as neither Peszke/Racine expressed any interest to own it.

**A. Peszke/Racine were never interested in the property and Green enlisted JFM as the attorney to remove the clouds on title to arrange for Healey to own the property outright**

15. Catherine McBurney died in 1952-which left two remaining under the 1946 Will (Green and Healey). In 1966, Green attempted to deed her interest over to Healey and JFM had handwritten a 1965 warranty deed to give John Healey full Fee Simple title ownership (**Ex.4**-recorded after Greens death). Even though she was trying to secure for her nephew (Healey) an outright ownership in the property, Susan Green could only transfer whatever interest she had-because of the 1946 Will. She always considered the house to be Healeys. If the Release/appropriate documents were executed at or before the time that this deed was executed then she effectively provided Healey with a Fee Simple Absolute interest in Fruit St.-Pawtucket. Green died in 1966. Healey lived alone there.

16. Alice Smith of Mattapoisett, MA, JFMs sister and 1st cousin to Peszke/Racine had always maintained a friendship with them no matter where they resided in the US and despite the fact that her father John McBurney Sr discriminated against Peszke/Racines mother (his sister) who remarried a protestant man. ***John, Sr. took Healey away from his mother when she was banished away from the family. He did so because he wanted Healey raised catholic-1920's.***

17. Alice Smith always felt sorry for this discrimination and mistreatment. Alice Smith would always provide family news and 'fill-in' all details to both Peszke/Racine throughout all times no matter where each lived. They are cousins. However, Healey never held any kind of relationship with Peszke/Racine who regarded him with disdain and disregard. When Healeys mother (Mary) died in 1975, Healey paid no heed; the family rupture was that divisive. John, Sr. died during this time as well so the only '*real*' family Healey had was JFM.

**B. JFM provides 'ever-increasing' financial, legal and personal assistance to Healey**

18. Throughout the 50's-60's and all the way through until Healey died, JFM took on an ever-increasing role as Healeys caretaker and benefactor. Increasingly, Healey became more dependent upon his cousin (JFM-both financially and personally) who with boundless generosity would provide financial, legal and personal assistance to Healey-not only to take care of the property but also to take care of Healey for all personal needs. All the other McBurneys (Peszke/Racine) treated him as a vile and unsavory person.

19. This action, in turn, would necessarily cause Kevin to render assistance when he would be directed to do so by JFM. Kevin always served at the whim and direction of his father as a 'go-fer/errand-boy, always performing constant errands and chores to serve Healeys interests but at the direction of JFM.

20. JFM had also contributed to maintain the Fruit St property where Healey was living but it continued to deteriorate to become condemned and uninhabitable. The City of Pawtucket issued numerous housing/zoning violations that JFM took on the responsibility for curing with Kevin serving his interests as well.

21. Also during this time, Peszke/Racines address and telephone number were always known to JFM (law office) and they communicated frequently no matter where they would reside in the US at a particular time. Alice Smith would always communicate with Peszke/Racine. There is plentiful evidence of communication throughout all times-during the 60's and continuing through to the 80's with more frequency 1982-3 then up to and through the time of Healeys death-6/30/99-uninterrupted communication.

22. JFM misstated to Atty. Martha Day when he hand-wrote a letter (dated 5/1/05) and said that he had NOT "seen, spoke to or communicated since with (Peszke/Racine) since WWII (**Ex. 5**). Not true as multiple letters clearly show that they always communicated.

**C Healey, JFM and Christene McBurney gather to plan to clear title to extinguish any possible right of interest the heirs of Mary A. Sherman might have to Fruit St**

23. During 1982-3, there are numerous documents, letters and other writings that clearly show that there was an attempt to have the 'heirs' and others connected 'sign-off' by deed (prepared) in order to ensure that Healey gets the property free and clear. The documents reviewed collectively show that there was widespread communication and correspondence between the McBurney law Office, John Healey and Peszke/Racine and that an attorney-client relationship existed as well-between JFM and Peszke/Racine. The addresses and telephone numbers of all parties were always known to each other.

24. There are also documents,letters and records that show there was"willingness for Peszke/Racine to sign off to John Healey". They also show that the McBurney lawyers (JFM and Christene) were aware of the title issues relating to the 1946 Alice A. McBurney Will that effected Healey. They attempted to get Peszke/Racine and the heirs to execute a transfer of all rights and interests in Fruit St. property to Healey

25. No one ever informed Kevin MCBurney or Belkis Florentino of any of these aforementioned title issues or the existence of the 1946 Will. As of 2001, Kevin McBurney and Belkis Floretnino were always told-"don't worry about the sisters, they have no interest in it, they signed off with the Release"-which is apparently what resulted after all of the 1983 'exchanges'. If Kevin and/or Belkis would have known of the title 1946 Will issues then they never would have become involved.

**D. . AS of 1983, it seems clear that McBurney law Service, JFM, Christene and Healey were resolved that Peszke/Racine would not/ should not be allowed to own this property after Healey's death.**

26. Since Peszke/Racine never 'contributed a dime' to Fruit St and otherwise showed no interest then they were not deserving BUT Healey and the property kept

'draining' JFM and there was no plan to refurbish and renovate (as Belkis Florentino did). Healey continued to cause JFM hardship and expense as he remained dependant upon JFM-who lost interest in the property after Healey died because it was too much of an expense (city violations, complete disrepair, deterioration, taxes accruing, Healeys criminal infractions, etc. and more). Despite their signing the release, Peszke/Racine were constantly 'urged' to take over the property but they did not want the 'head-ache'.

27. During the1990's ,Kevin McBurney was actively assisting JFM to tend to Healey and the property-Kevin McBurney had been 'kicked out' by his brother and sister and was no longer earning income as an attorney. Both he and Healey were 'dependant upon JFM'. During his 2/9/06 depo, JFM acknowledged that Kevin McBurney was actively involved with working, laboring and assisting him with the care, maintenance and repair of the 25-27 Fruit Street property and the general well-being of Healey himself. As a result of the McBurney family breakdown, Kevin had an abundance of free time to work on the 'Healey problems'-physical labor, legal work and personal menial chores (go-fer)-all at JFM's direction and control with Healeys complete acquiescence and endorsement.

28. In consideration for all of Kevins efforts and labor on behalf of Healey, the property and JFM, Healey executed a transfer by Warranty Deed of all right, title and interest in 25-27 Fruit Street in Pawtucket on November 16, 1996 **(Ex. 6)**. Peszke/Racine had already signed the Waiver and Release of all their rights and claims on the property as Kevin constantly reassured that they had no interest in the property or Healey.

29. Kevin McBurney trusted his father and John Healey. Healey signed freely, with sound and disposing mind and body and JFM notarized the signature. Kevin was finally rewarded for all his hard labor, work and chores performed for JFM, Healey and

the property. The deed was delivered by or on behalf of Healey and acceptance was made by Kevin McBurney as a simultaneous exchange. But Kevin was not permitted to record the document because Kevin would NOT accede to JFM"s demand to terminate the lawsuit against Christenes husband at the time, Richard James (KC C.A. No.96-24). Kevin fell out of JFM's good graces.

30. Once the 11/16/96 Deed transfer was completed (perfected) it was clear that there was going to be a 'stalemate' between Kevin and JFM; the deed could not be recorded so long as the Richard James lawsuit remained pending. Neither person would budge or give in. As Kevin McBurney was still obligated to JFM for his support and maintenance then an impasse resulted. The impasse was broken over the 'Devin Larue' (alias Edwin Ellingwood) episode:

31. Devin Larue, age 32, was a friend of Kevin's only client Malek Ahmed. Larue, whose real name was Edwin Ellingwood was a computer genius and an outstanding legal writer. It was unclear why he used an alias. In any event, Larue wrote every legal paper and document that Malek Ahmed ever submitted-for free. However, there came a time when Larue-Ellingwood needed a place to live so Kevin spoke with Healey and JFM who consented to allow Devin to live on the 2nd floor at 25-27 Fruit Street. It was a shambles but Devin lived there anyway. He also continued to do all the legal work from the same address with his computer installed. Larue , with JFM's help and Healeys awareness, 'tapped into' Healeys electrical and heating circuitry from the first floor in order to receive electrical power and heat to Mr. Larues 2nd floor apt. Healey might have been receiving government assistance for this utility service by which two units were now sharing. Also, Larue was tapping into and using Healeys telephone line and other services for his personal usage and without contribution. JFM and Healey had never objected.

32. There did come a time when JFM (Healey) brought action against Larue and Kevin in the Pawtucket Municipal Court and also filed criminal charges for matters that Healey and JFM previously understood and acquiesced--matters involving deeds, misuse of utilities and allegations of fraud were just a false ruse by JFM who already acquiesced to all such matters complained of. He was just angry over the homosexual revelations re: Healey and Larue which was ***only*** reason why JFM reacted so negatively as Healey and Larues friends were carrying on with homosexual parties at the Fruit Streetestablishment. JFM kicked Larue out of the Fruit St. house and caused Healey to file in Municipal Ct. against Larue and Kevin. JFM also told Kevin to leave the Arlington Street house. Plus, he told Kevin to physically give him the 11/16/96 deed which he did. Kevin left RI.

33. On January 14, 1997, JFM caused Healey to execute a Corrective Deed **(Ex.7)**. JFM caused Healey to convey title back to himself to attempt to give Healey all of the right, title and interest in the 25-27 Fruit street property. JFM now held the 11/16/96 deed in his possession and it was never recorded. This was all just a blatant attempt to renounce/un-do Kevin's claim of ownership of the property by virtue of 11/16/96 deed which was delivered and Kevin accepted in his possession (until JFM told him to hand it over). Real Estate transfer laws cause the corrective deed to be a nullity without any effect whatsoever as to the validity of the 11/16/96 deed to Kevin McBurney.

34. JFM then decided to give the property to Richard James-who was then being groomed as his protégé (until Mr. James was arrested by Pawtucket police and tried to hang himself over his cocaine addicition) . JFM caused Healey to execute a $39, 568 Promissory Note and a mortgage deed transfer to Mr. James **(Ex. 8)**. James never worked or contributed any effort or monies for the benefit of John Healey or the property. James merely received a gift as the direct beneficiary of JFM's 'extreme generosity'.

**E Healey dies 6/3099 and JFM 'pays for everything-even the funeral/burial costs but thereafter stops all further payments on Fruit St. It is abandoned-1999-2001. Peszke/Racine were disinterested and allowed Pawtucket to sell it**

35. Although invited, Peszke/Racine never attended Healeys funeral nor did they bother to contribute to pay any of the burial expenses. They would not even send flowers. As he always did, JFM paid all the bills. *However, he stopped paying for Fruit St property from that point on and it was left to deteriorate completely. No more taxes, insurance, water or sewer expenses were going to be paid.* Healey died without a Will.

36. After Healey died and same as before, JFM 'begged'_both sisters to take take over the property but they both refused while indicating complete detachment and disinterest.The property was a complete disaster; over-grown shrubbery, structurally rotted and corroded throughout with complete interior deterioration. It was uninhabitable and ready to be condemned,they wanted no part of it. As of the day of Healeys death , the last of the survivors set forth in the 1946 Will and Trust of Alice C. McBurney, their interest in the Fruit St property would have vested-if they had not signed the Release. ***However, there would also be issues of Equity that come into play-unclean hands, unjust enrichment, estoppel , prejudicial delay and other equitable grounds. They gave up on the property because it was too expensive. They let it go to tax auction.***

37. There were multiple letters of communication in 1999 between JFM and Peszke and Racine. JFM was acting as their attorney and knew how to contact them (Alice Smith as well) to make them aware of all details relating to two (2) John Hancock life insurance policies with John F. Healey as the named insured. They wrote letters 'back and forth'.This demonstrates that there clearly was communication between 'attorney and client' with the addresses, telephone and information readily known to each other. More importantly, this clear evidence of communication demonstrates that Peszke/Racine were notified of and made aware

that taxes were not being paid anymore by JFM and that the property would be levied for tax sale Peszke/Racine have always claimed that they were ignorant of the tax sale or that the taxes were due and owing and not paid but they were notified as JFM has stated. They have lied.

38. The Pawtucket tax sale of Fruit St. occurred on May/1999 and June of 2000. On May 25, 2000, Pleasant Management LLC of West Warwick, RI bought the property. All parties were properly notified-including the Peszke/Racine. Tax records clearly show it. They were disinterested. Taxes further accrued from 1999 and culminated in the 5/25/00 sale. However, Pleasant never filed a court action to foreclose on a right of redemption once the1 year and a day redemption period passed. There was no concern of that because nobody was interested in the property. Thereafter, taxes accrued again which were not paid and while ( sisters, were oblivious to all of these events, another tax sale was scheduled with Westcott buying the property this time. Before Westcott could foreclose upon the right of redemption, Kevin MCBurney and Belkis Florentino became involved-not as attorneys for the estate of John Healey but for themselves personally.

**QUERY:** ***Does Equity prevent or 'Estop' Peszke/Racine from being 'Unjustly Enriched' because they forfeited all of their rights to contest the tax sale when they never objected or attempted to redeem after being properly notified. Why should they benefit in any way under these circumstances just because the tax purchaser neglected to foreclose upon a right of redemption and another tax purchaser bought at auction. Equitable estoppel as well as their'Unclean Hands' bar them.***

39. Richard James falls into disfavor with JFM. Richard James was caught beating up his prostitute-girlfriend in Pawtucket while high on crack cocaine. James tried to hang himself in the cell-block because of his humiliation. This did not impress JFM as he gave up on his protégé and asked Kevin to come back to Rhode Island to represent him with his cases. Kevin was now back in JFM's good graces again and was allowed to move back into the Arlington Street house-rent free (late 2000-2001). As a 'reward' Kevin was given back the 11/16/96 deed. Kevin was allowed to record it immediately-6/21/01.

40. Kevin knew what he was going to do to 'fix the monster' at 25-27 Fruit Street, He was going to give it to Belkis to put it together because she had the knowledge, wherewithal and experience with real estate and the capability to fix it correctly when so many had failed before her. JFM was very supportive as he was paid $12,000.by her. Kevin McBurney initially transferred by warranty deed to Belkis Florentino's brother, Miquel (**Ex 9**, who was merely a 'Straw' holding it for Belkis until he quitclaimed it to her later in July of 2002 (**Ex 10**) This deed is an original document with JFM's genuine signature which clearly shows that he was a full participant in support of Kevin and Belkis's real estate dealings with this property-no forgeries and no fraud as he said in his deposition of 2/9/06. **This document and the Release are originals and are in Kevins possession so there is no dispute as to eachs genuineness of signatures**

41. Belkis then paid all outstanding taxes on the property, paid all redemption fees and expenses and then was responsible for the payment of $1000 to Richard James for his discharge of mortgage (**Ex. 10**) -all occurring on 6/21/01 or thereabouts. During this entire time, JFM always reassured that the plaintiffs (referred to as 'the sisters') had no interest in the property and had signed the release in any event. Kevin and Belkis relied upon same representations and decided to acquire to own and fix Fruit St. property.

42. JFM presented Mr. James with the discharge while he was a patient at butler Hospital; JFM paid James $1000 by his check. JFM wanted to assist Kevin and Belkis to clear and remove all clouds on title so that Belkis would swiftly expend monies to renovate and repair.

43. Belkis Florentino-undertakes a complete renovation June 2001-October 2002 with further maintenance for repairs and upkeep-$130,000-PLUS of her own money.

Belkis ,through Miguel, applied for housing assistance with Pawtucket Redevelopement Agency (PRA) and upon rejection, she and Kevin learned for the first time that there wa 1946 Will involving the sisters.

44. Belkis Florentino filed an action I the Superior Court for Declaratory Judgment Relief in 2003 (PC C.A. No. 03-6031). This case is still pending-inactive.

44. Peszke/Racine filed complaint for Declaratory Judgment (04-1684) but they never acknowledge that they signed a release or waiver of any claim to the real estate as they had always indicated to their lawyers (JFM and Christene McBurney) that they had no interest in same property. Now that Belkis had fixed the property to perfection, they decided to 'change their tune' and go after it. Peszke/Racine were always aware of Nor does the complaint draw reference to the fact that Peszke/Racine have always been aware of the progression of the repairs and the fine development of same property. They had previously declined any interest to acquire it at any time-only when it was refurbished and developed into a profitable estate at someone elses expense.

45. Also, it is noted that there is not one word in their pleadings that the aforementioned 1996 deed from Healey to Kevin McBurney contained a forged signature of John F. McBurney as notary. Furthermore, their attorney in that action wrote a letter to JFM on 9/30/04 and JFM responded thereafter by typed letter and also later with an handwritten note dated May 1, 2005 **(Ex.5)** Before the Fall of 2005, there is no writing or record document from JFM suggest or state that his signature on any deed or real estate transaction relating to John Healey or the Fruit Street property was anything less then genuine. Nor did he disavow or deny the validity of same 1996 deed transfer prior to that time. JFM was not hiding anything or protecting anybody at the time. It was later when Peszke/Racine/Alice Smith take advantage of an 'old man' did the lying begin.

46. Prior to this time, JFM was firmly allied with Kevin and Belkis and was ready to assist to defeat all claims of Peszke/Racine as to title and ownership of the property.

47. Inexplicably, JFM was deposed in 04-1684 on 2/9/06 and he testified falsely that his signature on the 11/16/96 deed as a notary is a FORGERY and that Kevin perpetrated an act of fraud with regard to Healey's property transfer to him. JFM had done a complete 'about-face' because Peszke/Racine/Smith intimidated and coerced,

48. They could not have known that Kevin already had 'the box' of all the relevant documents and letters dating back to the 20's that would discredit JFM's false testimony on 2/9/05 as well as their claims. There are many handwritten letters by and between JFM Peszke/Racine and Alice Smith-all concerning the property and all are incriminating.

49. On April 8, 2006, Kevin presented a slew of past ***original*** handwritten letters and documents-prepared contemporaneously with the past occurrence that are directly attributed to JFM and the defendants that clearly show that JFM not only signed the 11/16/96 deed as a notary (to witness Healey signing the deed)but he also endorsed this real estate transaction that gave Kevin a warranty deed to the Fruit street property.

50. It is a 'foregone conclusion' that JFM lied during his 2/9/06 deposition. However, the determination of the underlying circumstances as to this issue is the 'key' to understanding and resolving this controversy. Moreover, it gives rise to the claims that Kevin McBurney now asserts against the plaintiffs and they remain separate and apart from Belkis Florentino's claims in the Superior Court. Kevin McBurney has suffered great financial 'out of pocket' loss as well as the loss of his father and expected law partner. His claims are based upon Slander of Title and Intentional Interference-Prospective Business Relations and other related intentional torts relating to the defendants 'Subornation of Perjury and Conspiracy.

51. Kevin and Belkis first discovered that there was a 1946 Will with Peszke/Racine listed as possible heirs which would present as a 'cloud on title' when the PRA denied the application of Miguel on January 22, 2002 (**Ex. 11**). JFM , once again, reassured that Peszke/Racine were disinterested in the property. They began the process to sue Belkis Florentino, Kevin McBurrney and Miguel Florentino in Superiro Court not too long after this occurrence.

52. If a legal document has been alleged to been a product of fraud with forgeries of signatures of notaries, no less, then the AG, the Courts and the State Police must be informed to investigate. Furthermore, if an attorney is accused of same reprehensible conduct then you present directly to the Supreme Court and the Disciplinary counsel, David Curtin. Since late 2005/early 2006, Kevin McBurney has been accused of perpetrating fraud by forging JFM's signature YET none of the above has ever occurred. No one has suggested anything about it. It is not as if people want to protect Kevin in the State of Rhode Island-where he is despised in any event. They would like to 'hang him'. The truth is… that no one believes that JFM did NOT sign the deeds and they are not Forgeries (they know his signature). They just do not want to say anything to hurt such an esteemed and honorable citizen of this state. (JFM)

53. This lawsuit is about the converse or 'flip-side' of this question. WHY would these three old women, the defendants, cause this frail and sick elderly man self-inflict damage to his integrity and reputation upon discredit when the truth of his signatures on the deeds is so overwhelmingly clear. The defendants needed to cause a breach with the father-son relationship so that JFM would help them with their selfish pursuit to acquire the property that they had contributed nothing to be able to receive it. They lied to JFM

(telling him that "Kevin said you stole Healeys insurance money, heirlooms and $30,000 that belong to the estate", Kevin told Richard James what you have done and other nonsense. They also threatened to sue him, and they pressured and coerced him by spreading false innuendo and deceit in order to achieve their goal-to turn JFM against his own son. They must be held accountable and punished for 'pushing' a vulnerable 85 year old man into this action of discrediting himself to suffer indignation in the eyes of those who truly admired him. JFM is nearing the end of his life and the defendants have caused this to be the last memory people will have of him. This is the reason why plaintiff is suing the defendants. They put JFM up to this. When JFM is determined by this Court to have testified falsely then all claims of the Peszke/Racine would be adversely affected and resulting therefrom. They become discredited as well.

**COUNT I**

54. Paragraphs 1-53 are incorporated herein by reference

55. that the defendants have intentionally interfered with prospective business and personal expectancies and advantages the plaintiff would expect to derive with his father.

56. The plaintiff has suffered harm a resulting from same acts of interference.

**WHEREFORE. Plaintiff,** prays for damages against defendants pursuant to claims asserted and as determined by trier of fact, including punitive damages, and fees and costs.

**COUNT II**

57. Paragraphs 1-56 are incorporated herein by reference

58. That the defendants have intentionally conspired to promote , endorse and support directly in the act of committing the subornation of perjury.

59 The plaintiff has suffered harm a resulting from same specific intent to such an illegal and tortuous action.

**WHEREFORE. Plaintiff,** prays for damages against defendants pursuant to claims asserted and as determined by trier of fact, including punitive damages, fees and costs

## COUNT III

60 Paragraphs 1-59 are incorporated herein by reference

61. That the defendants have defamed and maliciously slandered plaintiffs rightful claim to title and deed ownership of the property in question.

62 The plaintiff has suffered harm a resulting from same tortuous action.

**WHEREFORE. Plaintiff,** prays for damages against defendants pursuant to claims asserted and as determined by trier of fact, including punitive damages, fees and costs

## COUNT IV

63 Paragraphs 1-62 are incorporated herein by reference

64 That the defendants have misrepresented with false statements uttered with the intention and design that same be relied upon to the detriment and harm of the plaintiff.

65 The plaintiff has suffered harm as resulting from the acts of fraud having been perpetrated upon him by the defendants.

**WHEREFORE. Plaintiff,** prays for damages against defendants pursuant to claims asserted and as determined by trier of fact, including punitive damages, fees and costs

## UNJUST ENRICHMENT

66. The defendants have received an unfair and improper gan and benefit by virtue of their illicit and wrongful conduct as detailed herein and would receive a windfall gain and advantage that they did not fairly earn or achieve

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R.Civ. P 38 (b), plaintiff demands trial byjury of all issues so triable under the law.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF PRAYS THIS COURT:

- Find that the defendants are the cause and effect to promote , endorse and support directly in the act of committing the subornation of perjury that had taken place in 04-1684,.

- Find that the defendants set forth by their agreement did conspire to accomplish the wrongful act or unlawful objective to coerce, intimidate or otherwise cause a vulnerable person to testify falsely based upon the defendants precipitating false actions and with the specific intent to such an illegal and tortuous action.

- Find that the defendants had intentionally interfered with plaintiffs prospective personal and professional relationship, affairs and expectancies with his father.

- Find that defendants had maliciously uttered false statement and further misrepresentation of truth as effecting the plaintiffs rightful claims to deed and title of the real estate in question-causing JFM to suborn to perjury about the assertion of forgery of his notary on the 11/16/96 deed.

- For any other and equitable relief, including restitutionary relief, loss of business venture, revenue, loss of profits and all pecuniary loss incurred to prosecute this action.

- For punitive damages according to proof at trial because of their willful, wanton ad malicious actions defendants incurred.

-award attorneys fees and costs of action.

- For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Kevin McBurney
38 Maple Street
Providence, RI 02903
401-521-1203

Dated: April 9, 2008